UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES COZZENS, *et al.*,                                        Case No. 08-11778

           Plaintiffs,                            John Corbett O'Meara
vs.                                                            United States District Judge

CITY OF LINCOLN PARK,                                          Michael Hluchaniuk
                                                               United States Magistrate Judge

           Defendant,
and

PAPALAS DRIVE DEVELOPMENT,
LLC, *et al.*,

           Defendant Intervenors.
_____/

## REPORT AND RECOMMENDATION
## JOINT MOTION FOR SANCTIONS (Dkt. 72)

## I.    PROCEDURAL HISTORY

Defendant, City of Lincoln Park, and the intervening defendants, Papalas

Drive Development, LLC and HDV-Lincoln Park, LLC (collectively, petitioners),

filed a joint motion for sanctions against plaintiffs and Marion Bednarski, the

proposed intervenor, and his counsel, Cindy Victor and Lynne Geist (collectively,

respondents).  (Dkt. 72).  Respondents filed responses and petitioners filed replies.

(Dkt. 82, 84, 93, 95).  Supplemental briefs were filed by the parties for various

reasons.  (Dkt. 159, 162).  This motion was referred to the undersigned on January

5, 2009.  (Dkt. 76).[1]  On March 13, 2009, Judge O'Meara granted summary judgment to petitioners.  (Dkt. 115).

The Court determined that an evidentiary hearing was required in that disputed questions of fact were alleged by both sides, and over the course of the subsequent year, the evidentiary hearing took place on approximately 10 separate days.[2]  The evidentiary hearing finally concluded on January 22, 2010. Respondents filed post-hearing briefs on March 2, 2010 and March 3, 2010.  (Dkt. 209, 211).  Petitioners filed their responses to respondents' post-hearing briefs on March 30, 2010, and March 31, 2010.  (Dkts. 215, 217).

The parties agreed to bifurcate the issue of liability for sanctions from the issue of damages for sanctions, if sanctions were determined to be appropriate.

---

[1]  Although this motion was referred to the undersigned for hearing and determination, the undersigned is required to issue a report and recommendation.

[2]  Petitioners also filed a joint motion for attorney fees and costs pursuant to 42 U.S.C. § 1988 and Local Rule 7.1 against plaintiffs, including non-party Anthony Seagraves as an undisclosed partner in I-75 Outer Drive Adult Book Store, along with plaintiffs' counsel.  (Dkt. 121).  As will be forth in a separate order, this motion has been resolved.  The motion as to plaintiffs was resolved via the settlement agreement dated June 4, 2009.  (Dkt. 183-3).  As to plaintiffs' counsel, defendants stated on the record on June 10, 2011 that, given Mr. Gonek's testimony at the hearing, they were withdrawing the motion for sanctions against plaintiffs' counsel.  (Dkt. 154, Pg ID 4241).  This motion did not purport to be against the present respondents directly except that petitioner Lincoln Park argues that Bednarski should also be liable as an undisclosed partner under § 1988 in its post-hearing brief.  (Dk. 217, Pg ID 7118).  In that the liability of Bednarski under that theory was not argued in the original motion, it will not be considered under that basis for purposes of deciding this motion.

For the reasons set forth below, the undersigned **RECOMMENDS** that

petitioners' motion regarding liability for sanctions be **GRANTED** in part.

## II.   FACTUAL BACKGROUND

### A.   Summary Judgment Opinion

Judge O'Meara granted defendants' motion for summary judgment based on

plaintiffs' "unclean hands," concluding that defendants' argument was detailed

and well-supported.  (Dkt. 115, Pg ID 2983-84).  As Judge O'Meara noted,

"[a]lthough these are serious allegations, they are borne out by the record":

> On November 20, 2007, Plaintiff James Cozzens
> submitted a certificate of occupancy application for his
> proposed adult bookstore. In the application Cozzens
> represented that he had ten parking spaces assigned to
> his business. Along with the application, Cozzens
> submitted a copy of a lease agreement for the bookstore
> premises, located in what is known as the Vanguard
> Building. The lease was dated November 1, 2007, and
> expired October 31, 2008.  The landlord identified on the
> lease was Stanley Sikorski.
>
> On February 22, 2008, the City denied Cozzens's
> request for a certificate of occupancy because an existing
> adult business (the Intervenors' Hustler Club) was
> located within one thousand feet of the proposed
> bookstore.  Cozzens applied for a zoning variance, which
> was denied by the Zoning Board of Appeals. Cozzens
> filed this action on April 28, 2008.
>
> Defendant took the deposition of Sikorski on
> October 28, 2008. Sikorski testified that in April or May
> of 2007, Marion Bednarski approached him about
> renting a portion of the Vanguard Building, or buying

the building, for the purpose of opening an adult nightclub.  In October 2007, Bednarski introduced Cozzens to Sikorski.  Cozzens wanted to lease a portion of the Vanguard Building to establish an adult bookstore. Bednarski and Cozzens told Sikorski that the bookstore proposal was a "first step to something bigger." Ex. D. at 44.  It was Sikorski's impression that Bednarski was "calling the shots." (Footnote omitted).

Sikorski and Cozzens did enter into a lease for a portion of the Vanguard Building, but it was not the lease Cozzens submitted to the City. Compare Ex. A-3 (lease submitted to the City, referred to as "Lease 1") with Ex. G (lease Sikorski produced at his deposition, referred to as "Lease 2").  Lease 2 includes a diagram that shows that the proposed bookstore had three parking spaces assigned to it, as opposed to the ten spaces Cozzens represented to the City.  Lease 2 also expired on October 31, 2008. Cozzens paid the first and last months' rent as well as rent for January 2008, then stopped making payments.  Sikorski testified that Cozzens and his partner, Anthony Seagraves, are "waiting for the status of the opportunity to open an adult club."  Ex. D. at 27.

Indeed, Cozzens and Seagraves negotiated a third lease with Sikorski ("Lease 3"), which was not executed. Sikorski testified that Lease 3 was negotiated in February 2008 and was to be signed if they (Cozzens, Seagraves, and possibly Bednarski) got approval to open an adult nightclub. Ex. D. at 21-24, 53-59.  Lease 3 indicates that the premises were to be used as an "adult entertainment lounge," which Defendant contends involves topless dancing. Ex. J.

Until Sikorski's deposition, the City was unaware of Seagraves's involvement with the proposed project. The City was also unaware that Cozzens and Seagraves (and possibly Bednarski, although his involvement is

> unclear) intended to put an adult nightclub in the
> Vanguard Building, not an adult bookstore. Further,
> Cozzens apparently now admits that he submitted an
> invalid lease to the City (Lease 1). In their response
> brief, Plaintiffs point to Lease 2 as the "effective lease
> for the premises." Resp. at 5. Cozzens also apparently
> misrepresented the amount of parking available to the
> business on his certificate of occupancy application.

(Dkt. 115, Pg ID 2980-2982). Judge O'Meara concluded that it was clear to the court that plaintiffs came before the Court with unclean hands – they were not forthright with the City in seeking a certificate of occupancy for their business and offered no justification for providing an invalid lease to the City, for failing to disclose the involvement of Seagraves, for misrepresenting the amount of parking available, or for failing to disclose their true purpose – to open an adult nightclub. (Dkt. 115, Pg ID 2984).

B.   Findings From Evidentiary Hearings

Seven witnesses testified over the course of several months during the evidentiary hearing portion of this matter. The first of those witnesses was attorney Ben Gonek, who testified on June 10, 2009. Gonek testified that he began to represent James Cozzens in December of 2007 when he appeared on behalf of Cozzens at a Lincoln Park Zoning Board of Appeals meeting at which Cozzens was trying to get a variance from the City of Lincoln Park so he could open an adult bookstore across the street from the proposed location of the Hustler

Club, an adult club that was the subject of a state court lawsuit that was pending at that time.  Gonek met Cozzens for the first time at the meeting and was introduced to him by Bednarski.  (6/10/09, pp. 82-83).

In February of 2008, Bednarski asked Gonek to represent him in the state court suit in which Bednarski was being sued by his former business partners over the establishment of an adult club, referred to as the Hustler Club, in Lincoln Park. Bednarski had been involved in that state court suit for approximately a year and had other attorneys representing him prior to asking Gonek to represent him. (6/10/09, p. 81).  Gonek initially agreed to represent Bednarski, but changed his mind a few days later and refunded Bednarski's retainer.  *Id*.  Gonek was aware that Seagraves was involved with the Cozzens project and that Seagraves was paying the attorney fees for the present lawsuit that Gonek filed in April of 2008 as well as the attorney fees for Bednarski in the state case.  (6/10/09, pp. 59, 92). Prior to filing the present lawsuit, Gonek attended a meeting at the office of Victor and Geist.  Sometime after Gonek declined to represent Bednarski any further in the state case, Bednarski hired Victor and Geist to represent him in the state case and they were representing him at the time of the meeting prior to the present case being filed.  Besides the attorneys, the meeting was also attended by Bednarski, Sands, Cozzens, Seagraves and another attorney, Mike Weaver, who was also representing Bednarski in the state case at the time, attended part of the meeting

by conference call.  (6/10/09, p. 55).  During that meeting at the Victor firm office,

the attendees of the meeting discussed coordinating their efforts, between the

pending state case and the anticipated federal case, so that pressure would be put

on Bednarski's adversaries in the state case and that the efforts to open the Hustler

Club would be impeded.  (6/10/09, p. 228).  Gonek denied knowing, at the time,

that Bednarski had an interest in the Cozzens venture beyond that of supplying

vending machines to Cozzens if the bookstore opened and claimed that he would

not have represented Cozzens if he had become aware that Bednarski was more

involved.  (6/10/09, pp. 70, 157).

Gonek communicated with the Victor firm on several occasions after the

present suit was filed, but he denied that Geist was a "secret" co-counsel in the

present case with him although he acknowledged that Victor and Geist had

"suggested" that certain things be done in the present case.  (6/10/09, pp. 58, 111,

166).  After the Sikorski deposition in the present case Geist contacted Gonek and

asked how damning the deposition was.  (6/10/09, pp. 67, 103).  Gonek denied

that he agreed with Victor, Geist or Bednarski to prevent compliance with the

court order compelling the production of documents from Cozzens, Seagraves or

Bednarski.  (6/10/09, p. 139).  Gonek became aware that the Victor firm had filed

a motion to intervene in the present case on behalf of Bednarski but denied talking

about that motion with Victor or Geist before the motion was filed.  (6/10/09,  p.

94).  Gonek thought the motion to intervene that was filed was "odd."  (6/10/09,

p. 97).

The second witness to testify was Anthony Seagraves whose testimony took

three hearing days to complete.  He first testified on June 22, 2009, and then later

testified on August 20, 2009, as well as October 1, 2009.  Seagraves was a

business man who sold real estate and owned another adult club in the Detroit

area.  (8/20/09, p. 200).  Seagraves met Bednarski in the course of his ownership

of the adult club due to Bednarski's business of supplying vending machines,

including adult content video machines, to adult clubs such as the one owned by

Seagraves.  Bednarski introduced Seagraves to Cozzens.  According to Seagraves,

in late 2007 or early 2008, he entered into a business relationship with Bednarski

and Cozzens to establish a business to be known as the I-75 Outer Drive Adult

Bookstore.  (6/22/09,  p. 19-23).  Seagraves understood that the business was to be

an adult bookstore or an adult club located on Papalas Drive in Lincoln Park.  *Id*.

Hearing Exhibit 7 was identified by Seagraves as a handwritten agreement entered

into by Bednarski, Cozzens and Seagraves approximately four to six months prior

to the present lawsuit being filed.  (6/22/09, p. 23).  Seagraves recalled that

Exhibit 7 had been faxed to Gonek, at Gonek's request, on April 24, 2008, which

was four days before the present lawsuit was filed.[3]  (6/22/09, pp. 22-23).  Exhibit 7 purports to be an assignment of "all" of Cozzens' interest in an "adult book store/adult gentlemen's club" on Papalas Drive (the location on Papalas Drive was the building owned by Sikorski) in Lincoln Park to Bednarski and Seagraves as "50/50 partners."  The agreement also provided for Cozzens to be compensated for the assignment by receiving a three percent interest in the future business. Seagraves also testified that another agreement was entered into between Bednarski and Seagraves in relation to the operation of an adult business on Papalas Drive.  This other agreement, Exhibit 8, purports to create a partnership between Seagraves and Bednarski with respect to an "adult entertainment enterprise" in Lincoln Park based on a new license or a "previous license issued by the City of Lincoln Park."  Exhibit 8 also contains an acknowledgment by Seagraves of an "Adult Cab D License" having been issued to Bednarski by Lincoln Park, that Seagraves has provided funds to Bednarski for "retaining approval" from Lincoln Park and that an additional attorney will be needed to "negotiate with the Hustler Club and/or file suit against the City of Lincoln Park for non-issuance of an adult entertainment license to Marion Bednarski."  The first

_____

[3]  Seagraves noted the date of April 24, 2008, appeared on the fax header at the top of Exhibit 7 and recalled that was the date the agreement was faxed to Gonek.  (6/22/09, pp. 21-22).

page of Exhibit 8 indicates the agreement was made on March 28, 2008, but the signature page indicates it was signed on March 31, 2008. Seagraves testified that Bednarski told him that Exhibit 8 was also provided to the Gonek firm. (6/22/09, p. 26). Seagraves said that Bednarski did not really want an adult bookstore to open on Papalas Drive but wanted to have the bookstore authorized to open so that they would be "first in line" and that would prevent the Hustler Club from opening.[4] (6/22/09, pp. 27-28). The Hustler Club had not opened as of the time the present case was filed.

Seagraves agreed to fund the legal fees for representation of Bednarski in the state case. Bednarski retained the Victor firm to represent him in that matter, after being represented by several other attorneys, and Seagraves and Bednarski met with Victor and Geist early in April of 2008. At the first meeting, Seagraves paid some amount of fees to Victor and Geist and the course of the litigation was discussed. Seagraves recalled that at the first meeting Bednarski's interest in the bookstore venture was discussed and as well as the fact that Bednarski and Seagraves were interested in trying to stop the Hustler Club from opening.

---

[4] Lincoln Park had an ordinance that prevented two adult businesses from being located within 1000 feet of each other. If the "bookstore" was issued a certificate of occupancy before the Hustler Club was ready to open, the Hustler Club would arguably not be able to open due to being within 1000 feet of the "bookstore" location which was across the street from the site of the Hustler Club.

(6/22/09, pp. 29-31). Seagraves attended a second meeting, prior to the present case being filed, which included Gonek, Cozzens, Sands, Bednarski, Victor and Geist. (6/22/09, p. 28).

Facilitation of the state case began in early August of 2008. Seagraves wanted the litigation to come to an end and an agreement was signed on August 28, 2008, between Seagraves and Bednarski that required Bednarski to accept certain settlement terms, if proposed, in order to end the state litigation. Geist had emailed a draft of the written agreement to Seagraves for his review and he asked for some changes. (6/22/09, p. 37). This agreement was admitted as Exhibit 10 during the hearing. *Id*. Bednarski did not want to settle the state case through a cash settlement because he wanted to open an adult nightclub. (6/22/09, p. 39). Eventually, the case did reach a tentative settlement based on the facilitation that took place in September of 2008. Bednarski disagreed with Seagraves on the settlement because Seagraves wanted the litigation to end but Bednarski wanted an adult club. (6/22/09, pp. 40-41; 8/20/09, pp. 145-46).

The present federal case continued after the tentative settlement of the state case and discovery issues in the present case resulted in a meeting at Gonek's office in December of 2008. The meeting was attended by Cozzens, Seagraves, Bednarski and attorneys Gonek, O'Neill, and Geist. According to Seagraves, the issue of Bednarski's involvement in the bookstore venture came up during the

meeting and Gonek and O'Neill said that if Bednarski's interest in the bookstore

venture became known, it could be a problem because there had been an

injunction issued in the state case prohibiting Bednarski from interfering with the

efforts of the Hustler Club to open. As a result, O'Neill said that a document had

to be created that would appear to show that Bednarski did not have an interest in

the bookstore as of the time the federal case was filed. While Seagraves did not

say who drafted the agreement, an agreement was drafted during the meeting at

Gonek's office purporting to say that the bookstore venture was exclusively

between Cozzens and Seagraves, but it was backdated to April 10, 2008. (6/22/09,

pp. 44-47). This agreement was authenticated by Seagraves at the hearing and

admitted as Exhibit 11. (6/22, p. 48). A second backdated document was created

at O'Neill's direction at the same time. This document purported to be an

agreement between Seagraves and Cozzens whereby Seagraves loaned money to

Cozzens regarding the bookstore venture. (10/1/09, pp. 49-51). Seagraves said he

did not loan money to Cozzens as indicated in the document, but the document

was created because O'Neill said they needed it. *Id*. Geist was not present when

O'Neill asked Seagraves to backdate these documents. (10/1/09, p. 244).

Seagraves testified that Bednarski had located the Sikorski property and

believed that if Bednarski and Seagraves were able to set up an adult business at

that location, prior to the approval of the Hustler Club, it would block the Hustler

Club because two adult businesses cannot be located within 1000 feet of each other in Lincoln Park.  (8/20/09, p. 184).  Cozzens was not really involved in this effort.  A letter that was sent to Lincoln Park in February of 2008 regarding the pending application for the certificate of occupancy for the bookstore, purportedly by Cozzens, was "actually ... from Monty" in the sense that Seagraves testified he heard Bednarski dictate the terms of the letter to Cozzens.  (10/1/09, pp. 58-61; Ex. 14).  Cozzens was a personal friend of Bednarski and was recruited by Bednarski to be the apparent owner of the bookstore because Bednarski believed his name could not be associated with the venture due to the state court injunction. (8/20/09, pp. 185-86).  Cozzens was recruited after someone named "Lenny" was involved but "Lenny" and Bednarski got into a disagreement so Bednarski found someone else to act as the apparent owner of the bookstore.[5]  *Id.*  Seagraves also did not want his name associated with the bookstore project.  (10/1/09, p. 247). Bednarski had earlier obtained the necessary authority to open an adult club in Lincoln Park, but believed that authority had been "stolen" from him by the plaintiffs in the state case (who were also the intervening defendants in the present case) and his goal was to set up an adult club on the Sikorski property.  (8/20/09, p. 205).  Bednarski had made an attempt to establish an adult business at the

---

[5]  A person named Lenny Taylor was an employee of Bednarski at the time of these events.  (10/23/09, p. 47).

Sikorski property by installing adult video machines (peep shows) at that location before Cozzens was involved in these efforts. (10/1/09, pp. 256-61). Exhibit 36 was admitted for the purpose of establishing that Bednarski had made attempts to set up some adult use of the Sikorski property as early as May of 2007 by installing video machines, "peep shows" according to Seagraves, through an employee of Bednarski's named Lenny Taylor. *Id.*

James Cozzens testified that he was a childhood friend of Bednarski and that Bednarski invited him to become involved in an adult business venture on Papalas Drive in Lincoln Park. Cozzens had no prior experience with adult businesses. Bednarski told Cozzens they could open an adult bookstore but the real purpose was to open an adult nightclub. (6/22/09, pp. 90-92). Cozzens testified it was Bednarski who came up with the idea to put an adult business on the Sikorski property. (6/22/09, p. 105). In November of 2007 Bednarski told Cozzens that the bookstore could lead to a nightclub. (6/22/09, p. 106). Bednarski did not want to have his name associated with the bookstore project due to his involvement in "the other lawsuit." (6/22/09, p. 116). Cozzens was introduced to Seagraves and Sikorski by Bednarski during this process. Seagraves and Bednarski were "in charge" of the project. (6/22/09, pp. 106-07). Cozzens was told by Bednarski about the problems Bednarski was having with Papalas Drive Development and others prior to the application for the occupancy permit

for the bookstore.  *Id*.  Cozzens admitted signing Exhibit 7, the handwritten

assignment of any interest he had in the bookstore to Bednarski and Seagraves,

and to providing a copy of the document to Gonek at the time he retained him in

this matter.  Cozzens did not know if Victor or Geist were provided with a copy of

the agreement.  (6/22/09, pp. 96-97).

Cozzens acknowledged that Exhibit 14, a letter sent to Lincoln Park on

February 11, 2008, was drafted with the help of some "guy" with whom Bednarski

"hooked" him up.  (6/22/09, pp. 111-12).  Bednarski referred Cozzens to attorney

Gonek regarding the present litigation.  (6/22/09, p. 167).  Cozzens said he did not

really want to file the present lawsuit, but Gonek went ahead and filed it and

Cozzens decided to go along with it.  (6/22/09, pp. 101-02).  Gonek did not take

directions from Cozzens regarding the lawsuit.  (6/22/09, pp. 118, 143).

Richard Sands claimed to be a private investigator who was hired by

Bednarski in August of 2008 to investigate "something."  (6/22/09, p. 197).  Sands

believed he was hired by Bednarski because Bednarski was not happy with his

attorneys.  (8/20/09, p. 126).  Prior to being hired by Bednarski, Sands attended a

meeting with Bednarski, as Bednarski's "friend," at the Victor firm's office in the

"spring" of 2008.  Also present were Gonek, Geist, Seagraves, and Cozzens.

(6/22/09, p. 196).  The meeting was before the present federal suit was filed and

Bednarski stated, at the meeting, that he wanted a club rather than a settlement in

the case and he felt strongly enough about the subject that he had to be calmed down during the meeting. (8/20/09, pp. 60-61, 116). Later, Sands, who is not an attorney, filed an amicus brief in the present case purportedly objecting to an adult club being located on Lot 24 or Lot 25 on Papalas Drive. (8/20/09, p. 55). The retainer agreement for private investigator services with Bednarski was signed on August 14, 2008, and a draft of the amicus brief was sent to the Victor firm on August 31, 2008. (6/22/09, p. 191). Sands testified that he filed the amicus brief on his own, based in part on some personal tragedy that had taken place in his life, and without any input from Bednarski. (8/20/09, pp. 54, 69, 80). The amicus brief was filed on September 4, 2008. (8/20/09, p. 65; Dkt. 25).

Sands also testified that he filed a Michigan Bar Association grievance against Lincoln Park city attorney Edward Zelenak on September 25, 2008. (8/20/09, p. 46; Ex. 27). Sands claimed he did not file the grievance against Zelenak at the request of Bednarski. (8/20/09, p. 83). The grievance was based, in part, on the settlement terms in the state case Bednarski was involved in and a copy of the confidential settlement agreement in that matter was provided to Sands by Bednarski. (8/20/09, pp. 88-89). Sands denied he was attempting to help Bednarski set up an adult business through these efforts. (8/20/99, p. 95).

Stanley Sikorski owned the building across the street from Lots 24 and 25 on Papalas Drive in Lincoln Park. At some point in the "beginning of 2007"

Bednarski approached Sikorski about an adult bookstore or an adult club.

(10/1/09, pp. 144, 159).  Sikorski met Cozzens and Seagraves through Bednarski.

The initial lease was negotiated with Bednarski and Cozzens with Bednarski

making most of the decisions.  (10/1/09, pp. 146, 153).  Sikorski thought that

Bednarski was part of the "partnership" relating to this adult business.  (10/1/09, p.

149).  The initial lease was for 900 square feet but subsequent negotiations

involved a lease for 11,000 square feet.  The later negotiations were with

Seagraves, primarily, and also with Bednarski.  Cozzens was not very involved.

(10/1/09, pp. 149-53).  The later negotiations included a discussion regarding the

possible purchase of the building.  *Id*.

   Exhibit 29 was identified as a typed version of Exhibit 7.  (8/20/09, p. 154).

The signatures on Exhibit 29 purport to have been notarized by Laura Carr on

March 25, 2008.  Laura Arendt, f/k/a Laura Carr, testified she worked in a bank in

March of 2008 and Bednarski was a customer of the bank.  She recalled that she

knew who Bednarski was at the time and recalls notarizing his signature on the

document at the time.  She also recalled notarizing Cozzens' signature on the

document at that time because she mispronounced his name.  (12/10/09, pp. 7-8).

She did not remember Seagraves appearing in front of her in order that his

signature was notarized.  (12/10/09, p. 21).

Marion "Monty" Bednarski's dream was to own an adult club.  (10/23/09 Tr., p. 15).  Bednarski owned and operated Grosse Isle Vending during relevant time periods.  (10/23/09 Tr., p. 19).  His dream regarding an adult club included a venture beginning in 2003 with Ron Zolak and William Hathaway.  Bednarski and his associates then attempted to open an adult club at 1805 Papalas Drive in Lincoln Park but were "spot zoned" by the City of Lincoln Park.  Bednarski's contribution to the venture included sharing expenses and doing the "work" associated with attempting to obtain approval from Lincoln Park to establish such a business.  Bednarski learned the "trade secrets" of zoning issues in Lincoln Park over more than 40 years "as a vendor and owning bars."  (10/23/09 Tr., pp. 15-16).

Bednarski later obtained a site plan approval for an adult club on Lot 25 of Papalas Drive in Lincoln Park in July of 2004.  (Ex. 56, ¶ 11).  He subsequently formed a joint venture with Charles Shattelroe regarding this adult club.  *Id.*, ¶ 13. Shattelroe and Frank Didario formed a limited liability company called Papalas Drive Development (PDD) and purchased Lot 24 on Papalas Drive, in August of 2006, which was immediately next to the lot where Bednarski had obtained the site plan approval for an adult club.  *Id.*, ¶¶ 14-15.  For reasons that are not clear from this record, but apparently pursuant to some understanding between Bednarski and PDD, the site plan approval for Lot 25 was transferred to Lot 24 in November of 2006.  *Id.*, ¶ 20.  Bednarski felt he was "duped" into transferring the

site plan approval to Lot 24 and felt he was treated unfairly by the others in this joint venture and that the others had "stole" his expertise that he had applied to this project over a seven year period. (10/23/09, pp. 31-40). For whatever reason, the relationship between Bednarski and PDD soured, and that breakdown resulted in PDD filing a lawsuit in state court against Bednarski in February of 2007. *Id*., ¶ 22.

Bednarski and Cozzens were childhood friends and Bednarski said he advised Cozzens to open an adult business in the area of the adult club with which Bednarski was involved. Bednarski said it was Cozzens' idea to open a bookstore even though Cozzens had no prior experience with an adult business and Bednarski denied he sought to open the business **with** Cozzens. (10/23/09, pp. 40-43). Bednarski said he knew about the Sikorski building and merely told Cozzens about it so that Cozzens could "supplement the Hustler [Club] business and make money." According to Bednarski, it was Cozzens' idea to open an adult bookstore and Bednarski denied he negotiated with Sikorski with respect to renting the building for any adult business. *Id*. at 43- 46. Bednarski did not assist Cozzens in the process of opening the bookstore because he "didn't care" what Cozzens was doing. (10/23/09, p. 159). Bednarski denied knowing about the rule that would have prevented an adult club like the Hustler Club from being located across the street from an adult bookstore. *Id*. If a bookstore did open, Bednarski

acknowledged that he was going to supply video viewing machines at the bookstore and make some money.  (10/23/09, pp. 51, 72).

Bednarski was represented by attorney Beck in the state case but Beck withdrew from representing Bednarski in that matter in December 2007 and Bednarski hired Gonek to represent him.  Gonek was hired by Bednarski well before the Cozzens' litigation and before Cozzens hired him.  (12/10/09, pp. 137-38).  Bednarski testified that he was unhappy with Gonek and terminated Gonek's services.  (10/23/09, pp. 80-82).  Gonek also represented Cozzens, but Bednarski did not recall how Cozzens ended up with Gonek as his attorney.  (12/4/09, p. 174).  Bednarski did not remember ever being present at a meeting in which an intent to stop the Hustler Club was discussed and denied he had such an intent because he wanted to get the money he felt entitled to from the settlement of the state case.  (10/23/09, p. 94).  He also denied attending a meeting with Seagraves and Cozzens where attorneys were present except for the meeting at Gonek's office in December of 2008.  (10/23/09, p. 204).

Bednarski denied involvement in initiating the present litigation and only heard "somewhere" that Cozzens had started the federal court case.  (10/23/09, p. 75).  He acknowledged that he introduced Cozzens to Seagraves suggesting to Cozzens that Seagraves might be willing to finance the bookstore venture but did not know what they agreed to.  (10/23/09, pp. 115-16).  However, Bednarski

denied he knew Seagraves was involved in the bookstore venture when he first met with the Victor firm. Seagraves went to the Victor firm with Bednarski because he was a partner in the state case. (10/23/09, pp. 83-84, 88-89).

Although Bednarski said he "probably" signed the agreement with Seagraves regarding settlement of the state case (Exhibit 2) he felt "forced" by Seagraves to sign it. (10/23/09, pp. 97-99). He denied knowing who drafted Exhibit 2. (12/4/09, p. 129). Bednarski signed a settlement agreement in the state case in September of 2008, after a facilitation, but Bednarski did not want to sign it and only signed it because Seagraves said he would quit funding the litigation. (10/23/09, p. 106).

Regarding the handwritten agreement assigning Cozzens' interest in the bookstore project, Exhibit 7, Bednarski denied signing it. (10/23/09, p. 119). Although he denied signing Exhibit 7, he had no explanation for the fact that the fax header on top of the first page was the number for Bednarski's business, Grosse Isle Vending. (1/8/10, p. 122). However, he admitted signing the "partnership" agreement with Seagraves, Exhibit 8, but claimed that agreement related to the state case. (10/23/09, pp. 119, 125). He also denied signing Exhibit 29, the typed version of Exhibit 7, which purportedly had a notary witness the signatures. (10/23/09, p. 139).

Bednarski acknowledged that he knew about the motion to intervene before it was filed but claimed he did not actually see it before it was filed and therefore was not aware that the motion alleged that his interests would be irreparably harmed by Cozzens succeeding in the present case. (10/23/09, pp. 147-52). He stated that Cozzens' interests in the case were opposite to his due to his continuing interest, at that time, in the Hustler Club venture. (10/23/09, pp. 152-54).

With respect to Sands, Bednarski denied hiring him to help stop the Hustler Club, denied that he provided Sands with a copy of the confidential settlement agreement in the state case, denied knowing that Sands referred to the settlement agreement in the state case in the grievance Sands filed, and denied knowing that Sands was going to file a brief in the federal case. (10/23/09, pp. 169-72, 175).

The hearing on October 23, 2009 ended with Bednarski stating that there "might" be other relevant documents that he had not yet turned over and he was ordered to search for those documents and turn them over. (10/23/09, p. 218). The next hearing date was December 4, 2009, and at the beginning of that proceeding a representative of the Victor firm stated that since the prior hearing Bednarski provided a number of additional documents that were reviewed by the firm and anything relevant was turned over to the opposing counsel prior to the hearing. (12/4/09, p. 17). Among the documents turned over was the document that became Exhibit 41. At first, Bednarski admitted signing Exhibit 41, but

denied reading it before it was signed.  (12/4/09, pp. 31-36).  He later

acknowledged that Exhibit 41 came from his files, that the document bore a fax

heading from the business where Seagraves worked, and that Exhibit 8 and

Exhibit 41 were two slightly different versions of a partnership agreement dated

March 31, 2008.  (12/4/09, pp. 213-18).  He then said someone must have cut and

pasted the signatures on Exhibit 41.  (12/4/09, p. 221).  He also claimed that some

unknown person dropped Exhibit 41 off in his mailbox after he started testifying

in this matter and expressed the view that he was being "set up."  (12/10/09, p.

119).

Bednarski claimed he was not aware that an adult bookstore on the Sikorski

property would affect an adult club across the street because Bednarski said he

was not aware of the Lincoln Park ordinance that prevented adult businesses from

being located within 1000 feet of each other.  (12/10/09, pp. 87, 96).  He did admit

to being aware of the provision (in the same ordinance containing the 1000 foot

rule) that said adult businesses must not be located within 450 feet of schools and

other similar uses.  (12/10/09, p. 95).

A lease for a portion of the Sikorski building was signed on November 27,

2007, although the face of the lease states it was executed on November 1, 2007.

(Ex. 16).  The Sikorski building was located along Papalas drive directly across

from Lots 24 and 25.  (Ex. 31).  The City of Lincoln Park had zoning codes

preventing adult businesses (including bookstores and cabarets) from being located within 1,000 feet of each other and within 450 feet of residential areas, schools and certain other properties. (Exs. 54, 55). An adult bookstore in the Sikorski building would be incompatible with an adult club (cabaret) on Lot 24 because it would be in violation of the 1,000 foot rule.

Cozzens purportedly applied for an occupancy permit for 1005 Papalas Drive on November 21, 2007. The application indicated it was for an "adult book store" and included the identification of Grosse Isle Vending (owner Marion Bednarski) as providing "video viewing devices" for the business. (Ex. 12). The document referencing the video viewing devices had 975 Papalas Drive indicated, but that was crossed out and 1005 was written next to it. The application was initially approved on December 6, 2007, but on December 21, 2007, that decision was reversed and money that had been paid, including money paid with respect to the video devices, was returned by the City. *Id.*

On January 11, 2008, the Lincoln Park Fire Department reported that they had inspected 1005 Papalas Drive (I-75 & Outer Drive Adult Book Store) on January 10, 2008, and determined that it satisfied fire and safety requirements. (Ex. 53). A letter was sent to Lincoln Park City Attorney Edward Zelenak on February 3, 2008, over the signature of James Cozzens, asking for the issuance of a business registration license, claiming that the "approval" on lot 24 had expired,

that the business (the bookstore) is a "permitted use," that the business location is more than 450 feet from "homes" and that the business site is an existing building that has passed inspections and is ready to go whereas lot 24 is not.  (Ex. 15).

There apparently was a response to the February 3, 2008 letter in that on February 11, 2008, Cozzens allegedly sends a second letter to the "Building Department and City Attorney" noting a letter dated February 10, 2008 (not a part of this record), and asserting that his business is over "10,000 feet" from the closest "adult use of existing adult business," that they are in compliance with "ordinance number 1294.33D," that they have been "waiting since November 2007," and that an "existing" business is not a "vacant lot," which was the apparent status of Lot 24 at the time.[6]  (Ex. 14).

The complaint in the present case was filed on April 28, 2008.  (Dkt. 1). The complaint alleges that Cozzens applied for an adult use license at 1005 Papalas Drive in November 2007 and was informed on February 4, 2008, that the application was being denied under Lincoln Park Ordinance 1294.33(b) (the 1,000 foot rule).  (Dkt. 1, ¶¶ 16-20).  The complaint further alleges that at the time of plaintiff's application there was no existing adult business within a 1000 foot

---

[6]  Lincoln Park Ordinance § 1294.33 contains both the restriction on adult businesses that provides they cannot be located within 450 feet of schools, libraries, etc. as well as the restriction that they cannot be located within 1000 feet of another adult business.  (Ex. 55).

radius of plaintiff's proposed adult business location. (Dkt. 1, p. 22). The complaint alleged that the Lincoln Park ordinance was unconstitutional and sought injunctive relief. The attorney representing Cozzens at the time the complaint was filed was Ben Gonek.

Bednarski had told Seagraves that he was subject to an injunction from the state case, which prevented him from interfering in the efforts of the Hustler Club to open an adult club on Papalas Drive. At some point, Bednarski came to believe that the injunction did not prevent him from intervening in the federal case and a motion to intervene was filed on June 11, 2008. (Dkt. 8). The motion to intervene alleged that at a June 5, 2008 hearing in the state case, Bednarski was informed that the motion to intervene could be filed. (Dkt. 8, ¶ 7). The motion further alleged that if the plaintiffs in the federal case were successful, it would cause "immediate and irreparable harm to Bednarski" based on his disputed interest in the adult club that was the subject of the state court litigation. (Dkt. 8, ¶ 11).

After the federal case was filed, the state case was scheduled for facilitation in late summer of 2008. By that time, Seagraves had tired of the litigation and wanted it to end. However, Bednarski did not want to settle the state case because he wanted an adult nightclub and apparently did not view settlement as a means to that end. On August 28, 2008, an agreement was signed that required Bednarski to accept a settlement in the state case if the terms of settlement were within

certain parameters.  (6/22/09, pp. 39-40; Ex. 10).  An agreement was tentatively reached as a result of the facilitation.

The relationship between Bednarski and Seagraves soured after that point and on October 30, 2008, Bednarski advised his attorneys, Victor and Geist, that he did not want them speaking with Seagraves any longer about the status of the state case.  (Ex. 51).  In December of 2008, Seagraves attended a meeting at Gonek's office relating to pending discovery matters in the federal case. Bednarski and Cozzens also attended that meeting along with Gonek, O'Neill and Geist.  At some point during the meeting, Bednarski's ownership interest in the bookstore venture was discussed and O'Neill indicated that he wanted some documents created, which would not reflect that interest.  An agreement was drafted purporting to show that the bookstore venture was a partnership between Seagraves and Cozzens only and that document was backdated to April 10, 2008. A second document was drafted and backdated to December of 2007, purporting to show that Seagraves had loaned Cozzens some money at that time.  (6/22/09, pp. 42-49; Ex. 11; 10/1/09, p. 49; Ex. 13).

## III.   LEGAL STANDARDS

### A.   The Inherent Authority of the Court

The Sixth Circuit recently examined the extent of the court's inherent authority to sanctions parties and their counsel for misconduct and the applicable

standards.  *Metz v. Unizan Bank*, 655 F.3d 485 (6th Cir. 2011).  First, a court may

assess attorney's fees under its inherent powers "when a party has acted in bad

faith, vexatiously, wantonly, or for oppressive reasons."  *Id.* at 489, quoting

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991).  Second, a court may award

attorney fees when the conduct is "tantamount to bad faith."  *Metz*, at 489, quoting

*Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980).  The court applies a

three-part test from *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308,

313 (6th Cir.1997), which requires the district court to find "[1] that 'the claims

advanced were meritless, [2] that counsel knew or should have known this, and [3]

that the motive for filing the suit was for an improper purpose such as

harassment.'"

    "[T]he mere fact that an action is without merit does not amount to bad

faith."  *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 753 (6th Cir. 2010)

(internal quotation marks omitted).  Rather, "the court must find something more

than that a party knowingly pursued a meritless claim or action at any stage of the

proceedings."  *Id*.  As explained in *Metz*, examples of "something more" include: a

finding that the plaintiff filed the suit "for purposes of harassment or delay, or for

other improper reasons," *Big Yank*, 125 F.3d at 314, a finding that the plaintiff

filed "a meritless lawsuit and [withheld] material evidence in support of a claim,"

*First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 523 n. 18

(6th Cir. 2002), or a finding that a party was "delaying or disrupting the litigation" or "hampering enforcement of a court order," *Chambers*, 501 U.S. at 46.  *See Metz*, at 489.

This inherent power to impose sanctions extends to a "full range of litigation abuses[,]" including those where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, when a party participates in an abuse of process or other dilatory conduct, or when the court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled." *In re Avon Townhomes Venture*, 433 B.R. 269, 304 (N.D. Ca. 2010), quoting *Chambers*, 501 U.S. at 46-47.  The court's inherent power to sanction for abusive litigation practices includes nonparties.  *See e.g.*, *Manez v. Bridgestone Firestone North American Tire, LLC*, 533 F.3d 578, 585 (7th Cir. 2008) ("No matter who allegedly commits a fraud on the court-a party, an attorney, or a nonparty witness-the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct.")[7]; *Elec. Workers Pension Trust Fund of Local*

---

[7]  Respondents cite to several cases regarding "fraud on the court" in the context of seeking relief from judgment under Federal Rule 60(b). *Info-Hold, Inc. v. Sound Merchandising, Inc.*, 538 F.3d 448 (6th Cir. 2008); *Carter v. Anderson*, 585 F.3d 1007 (6th Cir. 2009); *Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1994). The undersigned concludes that the standards in these cases are not applicable to the present case because they are not necessary for sanctions to be imposed under the inherent authority of the court and, while petitioners may have alleged that respondents conduct was fraudulent in some instances, petitioners did

*Union 58*, *IBEW v. Gary's Elec.*, 340 F.3d 373, 383 (6th Cir. 2003) (holding that

"if a corporate officer avoids a court's order to the corporation by failing to take

action or attempt compliance," the officer may be punished for contempt and "it is

fully appropriate to impose judicial sanctions on the nonparty corporate officer.'");

*In re Avon Townhomes*, 433 B.R. at 304 ("The court's inherent authority to

sanction includes not only the authority to sanction a party, but also the authority

to sanction the conduct of a nonparty who participates in abusive litigation

practices, or whose actions or omissions cause the parties to incur additional

expenses."); *Helmac Products Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563,

564-68 (E.D. Mich. 1993) (holding that the court has the inherent power to

sanction a nonparty who is not subject to court order if the nonparty had a

substantial interest in the outcome of the litigation and substantially participated in

the proceedings).

    B.    <u>28 U.S.C. § 1927</u>

    Petitioners have also moved for costs and attorney fees under 28 U.S.C.

§ 1927, which provides:

> Any attorney or other person admitted to conduct cases
> in any court of the United States or any Territory thereof
> who so multiplies the proceedings in any case

---

not argue for the imposition of sanctions under the "fraud on the court" basis as
argued by respondents.

> unreasonably and vexatiously may be required by the
> court to satisfy personally the excess costs, expenses,
> and attorneys' fees reasonably incurred because of such
> conduct.

The Sixth Circuit has held that the appropriate inquiry under § 1927 does not

require bad faith:

> the question under 28 U.S.C. § 1927 is whether
> Plaintiff's attorney "multiplie[d] the proceedings ...
> unreasonably and vexatiously."  An affirmative answer
> to that question does not require a finding of
> recklessness, subjective bad faith, or conscious
> impropriety; an attorney does not have carte blanche to
> burden the federal courts by pursuing claims that he
> should know are frivolous ...

*Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416 (6th Cir. 2006), quoting *Haynie v.*

*Ross Gear Div. of TRW*, 799 F.2d 237, 243 (6th Cir. 1986) (internal citations

omitted).  The Sixth Circuit has held that § 1927 "authorizes a court to assess fees

against an attorney for 'unreasonable and vexatious' multiplication of litigation

despite the absence of any conscious impropriety."  *Jones v. Continental Corp.*,

789 F.2d 1225, 1230 (6th Cir. 1986).  The Sixth Circuit explained that a finding of

"bad faith" on the part of the party in question was not required for liability under

§ 1927.  Rather, an attorney can be found to have unreasonably and vexatiously

multiplied the litigation, and an assessment of fees against that attorney is proper,

where:

> [A]n attorney knows or reasonably should know that a
> claim pursued is frivolous, or that his or her litigation
> tactics will needlessly obstruct the litigation of
> nonfrivolous claims.

*Trustees of Laborers*, *Local 310 Pension Fund v. Able Contracting Group*, *Inc.*,

2007 WL 184748, *3 (N.D. Ohio 2007), quoting *Jones*, 789 F.2d at 1230.  The

Sixth Circuit subsequently held that § 1927 sanctions are appropriate where:

"[A]n attorney has engaged in some sort of conduct that, from an objective

standpoint, falls short of the obligations owed by the member of the bar to the

court and which, as a result, causes additional expense to the opposing party."

*Shepard v. Wellman*, 313 F.3d 963, 969 (6th Cir. 2003) (internal quotation marks

omitted).  The standard for imposing sanctions under § 1927, however, continues

to be the objective standard announced in *Jones*.  *Able*, at *4, citing *Ridder*, 109

F.3d at 298.

     C.    <u>Federal Rules of Civil Procedure</u>

In order to impose sanctions on a nonparty under Rule 45, violation of a

court order is generally required in addition to the failure to comply with the

subpoena.  *Greer v. Home Realty Co. of Memphis*, 2009 WL 3757706 (W.D. Tenn.

2009), citing *Cruz v. Meachum*, 159 F.R.D. 366, 368 (D. Conn. 1994) ("Before

sanctions can be imposed under [FRCP] 45(e), there must be a court order

compelling discovery."); *Taylor v. Hart*, 2007 U.S. Dist. LEXIS 47385 (S.D. Ohio 2007).

Petitioners argue they are entitled to sanctions under the federal rules arising from Mr. Bednarski's improper motions for protective orders to preclude the depositions of Stanley Sikorski[8] and Mr. Bednarski.[9]  (Dkt. 72, Pg ID 1933-34).  Petitioners point to Federal Rule of Civil Procedure 26(c)(3), which, through Rule 37(a)(5), allows the court to award expenses pertaining to motions for protective orders.  Defendants also argue that Mr. Bednarski disobeyed court orders and should be sanctioned under Rule 37(b) as well.  *Id*.  In his initial response, Mr. Bednarski argues that there is no legal basis for seeking expenses under Rule 26(a)(3) or sanctions under Rule 37(b) because the Court had not yet decided his motion for protective order; thus, neither rule is applicable.  (Dkt. 82, Pg ID 2143-2145).  The undersigned does not base the decision in this matter on a violation of these various rules.

---

[8]  The motion for protective order relating to Mr. Sikorski's deposition was filed by O'Neill, not Victor or Geist (Dkt. 39) and was denied on 10/27/2008 via text-only order.

[9]  The motion for protective order relating to Mr. Bednarski's deposition (Dkt. 63) was deemed moot at the hearing on March 25, 2009 in light of Judge O'Meara's decision on defendants' motion for summary judgment.  (Dkt. 153, Pg ID 3853)

## IV.   ANALYSIS AND CONCLUSIONS

A.   <u>Bednarski</u>

Petitioners in the present case claim that Bednarski's conduct is sanctionable under the inherent authority of the court to punish the conduct of parties that is in bad faith, vexatious, wanton or undertaken for oppressive reasons. The specific conduct of Bednarski that petitioners claim warrants sanctions is the initiation of the present case, through an undisclosed surrogate, with the intent to mislead.  Generally, petitioners allege that Bednarski was the moving force behind the initiation of the present litigation - in an attempt to stop the Hustler Club from being built and operated by his former business partners - and in violation of an injunction that had been entered in the state court litigation between Bednarski and his former business partners regarding the Hustler Club, which prohibited Bednarski from engaging in conduct that would impede the Hustler Club from opening.  The undersigned concludes that if the evidence demonstrates, to a preponderance, that Bednarski did initiate the present litigation through an undisclosed surrogate, with the intent to mislead, it would constitute bad faith and should be sanctioned through the inherent authority of the court to punish such conduct.

In order to determine if Bednarski engaged in the conduct of which petitioners accuse him, it is necessary to analyze the evidence presented by the

parties to this matter over approximately 10 days of taking evidence.  That

analysis begins with evaluating the testimony of Bednarski who testified

extensively during this proceeding.  His testimony can be fairly summarized as

follows:  while engaged in a state court lawsuit relating to a dispute between him

and his former business partners over the right to establish an adult nightclub on

Papalas Drive in Lincoln Park, a childhood friend with no prior experience in the

adult entertainment business, approached him and sought his advice about

establishing an adult bookstore in the area of the site of the proposed Hustler Club.

Bednarski suggested a location across the street from the proposed site of the adult

nightclub, the Hustler Club, that was the subject of the litigation in state court.

Although Bednarski had spent years dealing with zoning issues in Lincoln Park

relating to adult businesses, Bednarski claimed he did not realize the location of

the proposed bookstore that he suggested to Cozzens, would conflict with the

proposed location of the Hustler Club.  Bednarski's testimony about these events

is not credible, is not supported by the majority of the other evidence in this case

and is inconsistent with common sense.

Generally, Bednarski was not a credible witness.  He frequently avoided a

direct response to a question and frequently denied reading any documents he

admitted signing when the contents of the documents presented problems for him.

He attempted to appear unsophisticated in business and legal matters, claiming to

rely on his attorneys and others for any decisions that had been made in the past. However, that claim was belied by his long experience in the business world and his regular, and often contentious, involvement with lawyers and legal matters. His obvious independence and strong sense of self-interest was not consistent with the persona he attempted to display during his testimony as someone not directly involved in the activities going on around him and dependent on others to inform him of what was taking place. Rather than being a trusting individual willing to accept what others said at face value, it was clear that he was suspicious of others and willing to challenge people, even the attorneys he had hired, through lawsuits, grievances and public complaints.

Bednarski's testimony was, in varying degrees, contradicted by just about every other witness who testified in this matter. Bednarski testified that Cozzens came to him and asked about opening an adult business on Papalas Drive and that Bednarski suggested he speak with Sikorski about leasing space from him. Basically, Bednarski testified the bookstore venture was initiated by Cozzens and Bednarski had little or no involvement in the venture other than making a few general suggestions to Cozzens. To the contrary, Cozzens testified that this bookstore/nightclub project was Bednarski's idea and Cozzens simply went along with it due to his friendship with Bednarski. Sikorski testified that it was Bednarski that first came to him about leasing space in his building and that it was

Bednarski that conducted most of the negotiations about the lease, even after he had been introduced to Cozzens. Bednarski testified that he had really nothing to do with what he characterized as Cozzens bookstore project, but Seagraves testified that Bednarski was a partner in that business venture with Seagraves, that Bednarski could not have his name associated with the project in light of the state court injunction and that Seagraves did not want his name publicly associated with the project. That leads to the logical conclusion that someone had to be recruited to act as their surrogate in this regard without disclosing the true ownership of the business venture. Cozzens, with no real business experience and an obvious lack of sophistication, was a very unlikely business owner but a perfect person to be the public face of the bookstore venture based on his long-time friendship with Bednarski and willingness to go along with the charade.

Bednarski said he had nothing to do with the application process for the bookstore venture, but Seagraves testified that he heard Bednarski telling Cozzens what to say in communications sent to Lincoln Park regarding the certificate of occupancy. Those communications also clearly demonstrate that Bednarski was behind the bookstore venture in that the two communications that were exhibits in this proceeding not only ask about the bookstore project but also make reference to another adult business that is not ready to go and therefore, by implication, the bookstore should be allowed to go forward because it is ready to open. (Exs. 14,

15).  In context, that other business must be the Hustler Club.  If these communications were just about opening the bookstore in all likelihood there would have been much less concern expressed about the other adult business. Additionally, it seems very unlikely that Cozzens would have attempted to start an adult business that, if allowed to open, would have prevented Bednarski's adult business from opening across the street from the bookstore.  However, it is highly likely that Bednarski would have wanted the "bookstore" to open so he could prevent the Hustler Club from opening under the ownership of his former business partners whom he thought had cheated him out of something he had long sought.

Bednarski testified that Sands was hired to be a private investigator for Bednarski but that Bednarski did not know that Sands attempted to intervene in the present suit and also did not know that Sands filed a grievance against one of the attorneys for Lincoln Park.  The grievance was based, in part, on the claim that City Attorney Zelenak acted improperly with respect to the settlement of an earlier federal case involving Bednarski's former business partners and also with respect to the state case that Bednarski was involved in.  Sands testified to the same circumstances and, in that regard, neither witness is credible.  It is simply not believable that Bednarski would hire Sands and Sands, coincidentally, would then attempt to file a so-called amicus brief in which he attempts to intervene in the action purportedly to argue that Lincoln Park was not complying with its own

rules.  The motion that Sands filed contends that the city was not doing what it was supposed to be doing but, also, contended that the plaintiffs in the action, Cozzens and the I-75 Bookstore, were "beyond reproach having had their property and business interests properly located."  (Ex. 22).  Additionally, the bar association grievance that Sands filed challenged the conduct of Zelenak, the Lincoln Park city attorney, in settling the prior federal case and with respect to the settlement in the state case that Bednarski was involved in - a settlement that Bednarski did not like and did not want to agree to but felt forced to.  (Ex. 27). It is not believable that Sands would have undertaken these actions without the knowledge or direction of Bednarski.  The conduct of Sands, trying to advance the interests of Bednarski without disclosing those intentions, is consistent with the employment of Cozzens to advance Bednarski's interests without disclosing that intent.  Although the evidence demonstrates that Bednarski orchestrated the actions of Sands, there is insufficient evidence that Victor or Geist caused Sands to undertake the actions he took on behalf of Bednarski in this litigation.

Seagraves testified over the course of several days in this matter.  Unlike Bednarski, Seagraves answered questions directly and logically.  His demeanor on the witness stand also gave him the appearance of a credible witness.  He testified that Bednarski was a partner in the bookstore venture, which he said was really an adult nightclub venture.  He described the sequence of events associated with the

state court litigation, which followed the dispute between Bednarski and his

former business partners and how the present federal court litigation was an

attempt by Bednarski to stop the Hustler Club from opening.  Seagraves identified

Exhibit 8 as the partnership agreement between he and Bednarski regarding the

bookstore venture.  As counsel for Bednarski has pointed out, Seagraves did not

explain why there were two very similar versions of the partnership agreement,

Exhibits 8 and 41, but in fairness to Seagraves, he was not presented with Exhibit

41 so that he could offer an explanation because it was produced in the hearing

after his testimony was completed.  Exhibit 8 is consistent with Seagraves'

testimony regarding the nature of the agreement - that it related to the agreement

for the bookstore/nightclub venture.[10]  Specifically, Exhibit 8 provided for the

opening of a "gentlemen's club" based on a "new license" or based on one

previously issued by the City of Lincoln Park.  Exhibit 8 also referred to filing suit

against Lincoln Park "for non-issuance of an adult entertainment license to Marion

Bednarski."  The only evidence of a "non-issuance of an adult entertainment

license" was the license applied for purportedly by Cozzens in November of 2007.

---

[10]  Bednarski appeared to acknowledge that he signed Exhibit 8 without
reading it, but gave somewhat conflicting explanations about it.  At first he
testified Exhibit 8 related to the state court litigation but later, when asked about
the portion of the agreement regarding retrofitting an existing building, he said
that related to a bar owned by Steve Smith, which was not in Lincoln Park.
(10/23/09, pp. 119-25; 12/10/09, pp. 149-55).

Exhibit 8 was signed on March 31, 2008, and the present lawsuit, against the City of Lincoln Park, was filed on April 28, 2008. Exhibit 8 is entirely consistent with Seagraves' testimony as to the relevant events. Exhibit 41 includes all of the provisions of Exhibit 8 plus, in paragraphs 23 and 24, there is additional language referring to Seagraves paying attorneys including Gonek for the efforts "for applicant James Cozzens [sic] for license at 975 Papalas Drive" and also indicating that Bednarski and Seagraves "have also hired a law firm for the adult book store to be leased on John Pappalas [sic] Drive for applicant James Cozzens, who in fact has sold said business to Tony Seagraves and Marion Bednarski."

The only witness to testify about Exhibit 41 was Bednarski. The background of the production of Exhibit 41 is the following: near the end of the hearing on October 23, 2009, Bednarski made reference to the possible existence of other relevant documents that had not been disclosed. Bednarski was directed by the undersigned to further search his records and produce any relevant documents and provide those to his attorneys who would provide them to counsel for petitioners. The next hearing date was December 4, 2009. At the beginning of the hearing that day, a record was made with respect to those documents that had been provided by Bednarski since the October 23, 2009 hearing. A representative of the Victor firm, Mr. McCollum, stated, under oath, that a number of documents had been provided to the firm since the last hearing by Bednarski, that Mr.

McCollum went through the documents and selected any that "appeared closely related" to the prior document request, and those were sent to the court and opposing counsel via email on November 16, 2009.  (12/4/09, pp. 5, 15-17).  The document that later became Exhibit 41 was among those documents produced in this manner and Exhibit 41 was not singled out at that time as being anything other than one of several documents from Bednarski's files.  When Bednarski first testified about Exhibit 41, he stated that he had signed it on March 31, 2008, but denied reading it beforehand.  (12/4/09, pp. 26-36).  Much later in his testimony that day, he acknowledged that the document had come from his files, but claimed that Exhibit 41 was not a "valid" document and that someone must have cut and pasted his signature on the document.  (12/4/09, pp. 214-21).  Bednarski testified again on December 10, 2009, and at that time, for the first time, claimed that Exhibit 41 had been dropped off in his mailbox by some unknown person and that Bednarski thought he was being set up.  (12/10/2009, pp. 119-20).  He testified again about Exhibit 41 on January 19, 2010, and repeated the claim that the document was "mysteriously dropped off in [his] mailbox" and expressed the view that the back page was from another document.  (1/19/2010, p. 43).  Nothing besides Bednarski's testimony supports the claim that Exhibit 41 was dropped off in his mailbox by someone trying to set him up.  His claim that he was suspicious of the document at the outset is inconsistent with his testimony about the

document when it was first introduced and his failure to mention his suspicion at the time. His claim that he took the document to his attorneys right away, believing the document to be suspicious, is belied by the general circumstances in which the document was produced in court. No evidence is in this record, other than Bednarski's testimony, to show that this document was turned over to opposing counsel and the court as anything other than it being one of several documents that was produced following Bednarski being directed to make yet another attempt to find relevant documents and turn them over. The strongest inference from these circumstances is that Bednarski brought this document and a number of others to his attorney's office at one time and the attorneys, as they were clearly obligated to do, produced the documents to the court and opposing counsel. As indicated earlier, Bednarski is not a very believable witness generally and his late claim that Exhibit 41 was a suspicious document that was dropped off at his house by an unknown person is not credible. Additionally, if someone was trying to set up Bednarski, as he claims, this does not seem like a logical way to do that. Leaving something in his mailbox, in the hope that he would find it and turn it over to his attorneys, does not seem like a plan that is well thought out. If someone were going to go to the trouble of creating false documents that would somehow be incriminating to Bednarski it seems as though they would be unlikely to do it in this manner in that there would have been a high likelihood that it

would not have come to light.  The undersigned concludes that Bednarski gave
false testimony as to Exhibit 41.

The evidence in this record is insufficient to clearly reconcile Exhibit 8 with
Exhibit 41 and any attempt to do that here would venture too far into the realm of
speculation.  Bednarski's possession of Exhibit 41, under the circumstances
indicated above, is an adoptive admission of its authenticity.  Fed.R.Evid.
§§ 801(d)(2)(B) and 901; *see also United States v. Marino*, 658 F.2d 1120, 11-24-
25 (6th Cir. 1981) (Possession of a written document may become adoptive
admission of its contents).  While Seagraves did not testify that there were two
partnership agreements, the important issue for this proceeding is that there was at
least one partnership agreement between Seagraves and Bednarski regarding the
bookstore project and either of these exhibits supports Seagraves' testimony that
Bednarski was a principal in the bookstore project and that the venture was
intended to thwart the construction of the Hustler Club.

Given the above analysis with respect to the facts in this matter, the
undersigned concludes that Bednarski initiated the present litigation through the
use of a surrogate who was employed to hide Bednarski's interest in this litigation
and that such conduct was undertaken with the intent to mislead.  This is litigating
in bad faith and exposes Bednarski to being sanctioned by awarding costs to the
opposing party, including actual attorney fees.  The overwhelming motive for

filing the present lawsuit was the improper purpose of attempting to stop the construction of the Hustler Club through the subterfuge of having someone else, someone who would be perceived as completely independent of Bednarski, pursue this litigation so as to hide Bednarski's involvement in an attempt to circumvent the state court injunction that prohibited Bednarski from doing it in his own name.

As noted above, a three-part test for the imposition of sanctions under the inherent authority of the court was identified in *Metz*. The first factor in that test was whether the claims advanced were meritless. *Metz*, 655 F.3d at 489. Judge O'Meara's ruling dismissing the underlying case here is a determination that the present lawsuit was meritless. The undersigned also concludes that, even if Judge O'Meara had not ruled that the case should be dismissed, the case was meritless because the true plaintiffs in this matter had no real intention of litigating the constitutionality of the Lincoln Park ordinance in question. The goal of the litigation was to stop the Hustler Club by establishing a roadblock to the construction of the Hustler Club and the claim of unconstitutionality was just a facade behind which the plaintiffs sought to achieve their true goal. The plaintiffs never pursued any discovery and their affirmative requests for relief in this case were primarily attempts to stop the defendants and intervening defendants from obtaining information about relevant issues. (Dkt. 39, 45).

The second test factor is whether the parties or their counsel knew or should have known that the case was meritless. *Metz*, 655 F.3d at 489. Counsel for the plaintiffs at the time the complaint was filed were Gonek and O'Neill. They have been dismissed out of this motion for sanctions by petitioners and therefore no finding is necessary as to their knowledge of the merits of the complaint. However, it is clear, as explained above, that Bednarski knew of the false factual claims made in initiating this litigation and therefore was aware that the case lacked merit. The third test factor is that the motive for filing the case was for an improper purpose. *Id*. Also as noted above, the motive for filing the case was to block or delay the Hustler Club through this means based on false information that was knowingly represented with the intent to mislead. Under these circumstances, Bednarski is liable for an award of sanctions in an amount that will be later determined.

### B.   Victor and Geist

Petitioners also claim that attorneys Victor and Geist should be sanctioned for their involvement in this litigation. Petitioners request an award of attorney fees against Victor and Geist under the inherent power of the court to award sanctions and under 28 U.S.C. § 1927. Petitioners accuse Victor of Geist of a number of things that, according to petitioners, warrant the award of sanctions including actual attorney fees. The main contentions of petitioners involve (1) the

misrepresentation with respect to Bednarski's involvement in what has been referred to as the bookstore project, (2) the filing of a motion to intervene in the present case and the alleged misrepresentation contained therein regarding the nature of Bednarski's interest as compared to the interests of Cozzens, the disclosed plaintiff in the case, and (3) the efforts undertaken to allegedly thwart the discovery sought by petitioners in this matter.

As noted above, Bednarski was an undisclosed partner in the bookstore project and was the moving force behind the conduct that was associated with attempting to establish an adult business in the Sikorski building.  If Victor and Geist knew of that undisclosed interest and knowingly perpetuated that misrepresentation in their representation of Bednarski for an improper purpose, then they would be subject to an award of sanctions.  The evidence submitted during the hearings in this matter shows that Victor and Geist agreed to represent Bednarski in the state court litigation that began in February of 2007.  Victor and Geist did not get involved in the state litigation until approximately March or April of 2008, after Bednarski had gone through several other attorneys.  They began to represent Bednarski in the state case before the present case was filed on April 28, 2008.  Seagraves testified that he began financing the litigation costs of the state court litigation, some time after the litigation was started,  pursuant to an agreement he had with Bednarski.  Seagraves said that he attended a meeting with

Bednarski, Victor, and Geist where he paid the attorneys some money for their representation of Bednarski in the state case.  While not being sure of the exact date of the first meeting with Victor and Geist, he testified that Exhibits 7 and 8 had already been signed at that point.  Exhibit 8 was signed on March 31, 2008, and Exhibit 7, according to Seagraves, was signed several months before April of 2008 so it can be inferred, if Seagraves is believed, that the meeting was sometime after March 31, 2008, and he believed it to be in April of 2008.  (6/22/09, p. 30).  Seagraves was not certain that Exhibits 7 and 8 were shown to the attorneys at the meeting, but he did recall that both Seagraves' "interest" and Bednarski's "involvement" in the bookstore project were discussed including the fact that they were "50/50 partners in opening" the bookstore.  (6/22/09, p. 29).  However, Seagraves was not certain they discussed the "first in time" purpose of the bookstore, but he did say they discussed trying to stop the Hustler Club.[11]  Trying to stop the Hustler Club may not have been improper in and of itself - it is the attempt to do that through an intentional misrepresentation that crosses the line into improper conduct.

---

[11]  Trying to stop the Hustler Club may have been an appropriate goal of the litigation except for the fact that making such an attempt by Bednarski appeared to violate the state court injunction, which was the reason for Bednarski's efforts to keep his name hidden from others.

Another meeting took place at the Victor firm prior to the present case being filed.  That meeting was attended by Gonek, Bednarski, Seagraves, Cozzens, Sands, Geist and Weaver, with Weaver participating by conference call.  (6/10/09, pp. 55-57).  Seagraves described such a meeting and indicated that Victor was also present at the meeting.  (6/22/09, pp. 28-29).  Sands described what apparently was the same meeting but said Victor was not present.  (8/20/09, p. 61).  During the meeting, the attendees, according to Gonek, discussed coordinating the existing state case with the federal case and how the federal case would put pressure on Papalas Drive Development in the state case.  (6/22/09, pp. 28-29).  Sands described the meeting as a discussion about a "global settlement" of the issues involving the Hustler Club but could recall few specifics.  (8/20/09, pp. 59-60).

Petitioners rely on the testimony of Seagraves to establish that Victor and Geist knew, from the outset of their representation of Bednarski, that Bednarski had an undisclosed partnership interest in the bookstore project.  While the undersigned finds Seagraves to be a credible witness, his testimony about the subject matter of the first meeting with Victor and Geist is uncorroborated and circumstantially contradicted by some of the other evidence.   In the second meeting, which appears to have taken place close in time to the first meeting between Seagraves, Bednarski, Victor, and Geist in April of 2008, the individuals

involved presumably would have discussed subjects such as the true nature of the ownership of the bookstore project.  However, Gonek testified that during the litigation he did not know Bednarski had an interest in the bookstore project beyond that of being a vendor of video machines for the bookstore project and never considered him a real party in interest.  (6/10/09, pp. 70, 111, 157).  If Bednarski's ownership of the bookstore project were common knowledge in April of 2008, Gonek claims not to have known about it.  While there may be reasons to question the accuracy of Gonek's testimony in this regard (Seagraves testified they faxed a copy of Exhibit 8 - the partnership agreement regarding the bookstore - to Gonek on April 24, 2008 so presumably Gonek would have known about the ownership interest of Bednarski before the present case was filed), there is no other evidence to indicate that Bednarski's partnership interest in the bookstore project was clearly identified to the attorneys at the beginning of the case. Gonek's testimony with respect to not knowing about an ownership interest in the bookstore was not really challenged by petitioners.  There is at least as much evidence that Gonek knew about the partnership between Seagraves and Bednarski before the present case was filed as there is that Victor or Geist knew about the partnership agreement at the beginning of their involvement in this matter; but Gonek said he did not know and that testimony was not challenged.

The motion to intervene was filed on June 11, 2008, less than two months after the present litigation was started. The motion contains the claim that if the plaintiffs' case is successful, it will cause "immediate and irreparable harm to Bednarski" with respect to his claims regarding the Hustler Club. (Dkt. 8, p. 5). The brief in support of the motion also includes the statement that the interests of the plaintiffs are "wholly opposite to that of" Bednarski in that plaintiffs are attempting to enjoin the construction of the Hustler Club and Bednarski claims an interest in the Hustler Club. (Dkt. 8, p. 19). If the evidence were not sufficient to prove that Victor or Geist knew about Bednarski's partnership/ownership interest in the bookstore project in April of 2008, there is no additional evidence to show they learned of that interest by the time the motion to intervene was filed. The possibility that Victor or Geist knew only about Bednarski's intent to provide vending machines to the bookstore project was insufficient, by itself, to conclude that Victor or Geist knowingly included false information in the motion to intervene.

Both the state case and the present federal case proceeded through the summer of 2008. Initial facilitation efforts were undertaken in August of 2008 with respect to the state case. Seagraves, who was financing both cases, wanted the litigation to be over and took steps to achieve that goal. Exhibit 10 represents an agreement that was drafted whereby Bednarski was required to accept

settlement terms in the state case if those terms fell within certain parameters.

Exhibit 10 was signed on August 28, 2008.  Seagraves testified that Geist drafted

the agreement and submitted it to him for review and that he requested that certain

modifications be made before signing.  (6/22/09, p. 37).  Seagraves was certain

that he had faxed Exhibit 8 - the partnership agreement in the bookstore project

between Seagraves and Bednarski - to Geist or Victor prior to Exhibit 10 being

signed.  He also recalled that he faxed a copy of an agreement, executed on March

31, 2008, to the Victor firm relating to loans he had made to Bednarski, Exhibit 9,

before Exhibit 10 was signed but could not recall if he had sent them Exhibit 7 -

the handwritten agreement assigning Cozzens' interest in the bookstore project to

Bednarski and Seagraves as partners.  (6/22/09, pp. 37-38).  Seagraves testified

that he spoke personally with Geist about these various documents and she seemed

familiar with them.  *Id*.  Exhibit 10 contains two references to a "partnership

agreement" between Seagraves and Bednarski as well as to loans that had been

made to Bednarski by Seagraves.  There is no credible evidence that the term

"partnership agreement" in Exhibit 10 meant anything besides Exhibit 8.

Bednarski testified there was another purpose to Exhibit 8, but his explanation is

not believable and the undersigned concludes it was an agreement relating to the

bookstore.[12]  The content of Exhibit 10 corroborates Seagraves' testimony that he

provided copies of Exhibit 8 and Exhibit 9 to Geist prior to the time she drafted

Exhibit 10.  Therefore, the evidence demonstrates that Geist was aware of

Bednarski's ownership interest in the bookstore project as of sometime in August

of 2008.  The post-hearing memorandum submitted by Geist does not deny she

drafted Exhibit 10, does not point to evidence to discredit the testimony of

Seagraves that she drafted Exhibit 10 and does not point to any other partnership

agreement, besides Exhibit 8, between Bednarski and Seagraves that was referred

to in Exhibit 10.  (Dkt. 209).

　　　In early September 2008, a second facilitation took place in the state case.

Bednarski eventually accepted the settlement terms because, according to him, he

felt pressured to accept them.  He was not happy with those terms because he

ended up with money and without the adult nightclub to which he felt he was

entitled.  Even though the state case was tentatively resolved at that point, based

---

[12]  Bednarski said he thought Exhibit 8 related to the state court litigation but the terms of Exhibit 8 are not consistent with an agreement regarding the state court litigation.  Additionally, Bednarski stated that a reference to retrofitting a building in Exhibit 8 referred to a bar owned by a former attorney of Bednarski named Smith but that is not consistent with the other language of Exhibit 8 which provides that the gentleman's club will be established in Lincoln Park and the bar owned by Smith was not in Lincoln Park.  (12/10/09, p. 152).

on the facilitation terms, disputes regarding the facilitation agreement continued and the federal case continued on as well.

The next significant event in this litigation involved the discovery process. Defendant Lincoln Park and intervening defendant Papalas Drive Development sought to depose a number of individuals including Sikorski, Bednarski, Cozzens and Seagraves.  The Sikorski deposition was noticed to take place on October 28, 2008, but counsel for named plaintiffs filed an emergency motion to adjourn the deposition on October 24, 2008.  (Dkt. 39).  The motion was denied on October 27, 2008.  On October 29, 2008, the day after the Sikorski deposition, Geist sent an email to Gonek asking how "damning (or damaging)" the Sikorski deposition was.  Ex. 1.  This was well after the tentative settlement in the state case had been executed.

Depositions were noticed for Cozzens and Seagraves for December 17, 2008, and for Bednarski on December 18, 2008.  The deposition notices were served on Cozzens and Seagraves on December 5, 2008, and on Bednarski on December 8, 2008.  (Dkt. 60, Pg ID 1490; Dkt. 72, Pg ID 1928).  On December 15, 2008, plaintiffs' counsel notified defendant's counsel that Cozzens and Seagraves would not be appearing for those depositions.  (Dkt. 60, Pg ID 1490). On December 16, 2008, defendant filed a motion seeking to compel the depositions of those witnesses.  (Dkt. 60).  The motion to compel was granted as

to Cozzens and Seagraves only on December 16, 2008, with the expectation that

the depositions would go forward as previously scheduled on December 17, 2008.

After the decision that the depositions of Cozzens and Seagraves should go

forward on December 17, 2008, counsel for plaintiffs contacted counsel for

defendants and intervening defendants and represented that Cozzens and

Seagraves were not available on December 17, 2008, and asked that the

depositions be moved to December 19, 2008.  (Dkt. 72, Pg ID 1928).  Defendants

and intervening defendants agreed to move the date of the depositions on the

condition that all of the documents in the subpoena duces tecum would be

produced without objection.  *Id*.  That same day Bednarski, through Geist, filed a

motion for a protective order relating to his deposition and served objections to the

depositions of Cozzens and Seagraves with respect to documents that were

requested in the subpoena duces tecum served on them.  (Dkt. 63).  Geist also

informed defendant's counsel that Bednarski would not be appearing for his

deposition even though defendants felt it could go forward regardless of the

motion.  (Dkt. 72, Pg ID 1928).  Plaintiffs thereafter refused to produce any

documents at their depositions despite agreeing to do so earlier.  *Id*.

Seagraves testified that he attended a meeting at Gonek's office, which was

also attended by Gonek, O'Neill, Bednarski, Cozzens, and Geist.  (6/22/09, pp. 42-

44).  This meeting was a few days before his scheduled deposition.[13]  Bednarski's

ownership interest in the bookstore was openly discussed at the meeting.  Also

discussed was the fact that there had been an injunction against Bednarski

preventing him from attempting to stop the Hustler Club and if Bednarski's

interest in the bookstore project came to light it could interfere with the final

settlement of the state case.  *Id*.  During this meeting, O'Neill directed that certain

documents be drafted and backdated to the time periods prior to the lawsuit to

make it appear that Bednarski did not have an interest in the bookstore project.

(6/22/09, pp. 46-47).  Cozzens also testified that he attended a meeting before the

scheduled depositions in December of 2008, which sounded like the same meeting

Seagraves described, but he did not give much detail about the meeting.  (6/22/09,

p. 103).

       Shortly after this meeting, the motion for a protective order seeking to quash

the deposition of Bednarski was filed.  (Dkt. 63).  The motion alleged the

deposition of Bednarski was intended to harass him and the subpoena relating to

---

[13]  Petitioners argue that this meeting took place on December 18, 2008,
based on an entry in the billing records of the Gonek firm.  Ex. 33.  However, the
undersigned concludes that the meeting described by Seagraves took place prior to
December 17, 2008, which was the initial scheduled date for his deposition.  It
may well be that there was another meeting on December 18, 2008 that included
Geist, but that was not the meeting Seagraves described, which logically must
have taken place a "few days" before  December 17, 2008.

the deposition sought documents that were "personal and confidential" as well
documents that were sought with the "improper purpose of obtaining knowledge
respecting prospective competing businesses to the Hustler Club." *Id*. The
following day, December 18, 2008, objections to the depositions of Seagraves and
Cozzens were served. These objections contend that the deposition subpoenas for
both Cozzens and Seagraves ask for "many documents" that are attorney-client
privileged documents from Bednarski's point of view, that contain "proprietary
and confidential information" relating to Bednarski, that the subpoenas were
"overbroad" and not relevant. Ex. 5.

Respondents argue the merits of the motion for the protective order and the
objections to the depositions of Seagraves and Cozzens by pointing out that the
motion for the protective order was later denied as moot, rather than denied on the
merits, and the subpoenas they objected to were similar to subpoenas quashed by
the undersigned in June of 2009 during the evidentiary hearing in the present
motion for sanctions. The quashing of the subpoenas in June of 2009 should not
be viewed as a decision on the merits as to the propriety of those subpoenas.
Rather, it was a decision that applied mutually to the parties to this controversy,
and which was designed to put a stop to excesses on both sides regarding
documents being sought. More reasonable requests for documents were made by

the parties following that June 2009 decision, which was the goal of the
undersigned.

The undersigned concludes that, coming on the heels of a meeting in which
discussions took place regarding backdating documents to cover up the
involvement of Bednarski in the bookstore project because it would have a
negative impact on the state case, the case Geist was directly involved in, the
motion for protective order and the objections to the depositions of Seagraves and
Cozzens were primarily intended to block petitioners from gaining information
regarding Bednarski's true interest in the bookstore project.[14]  This conclusion is
also supported by Geist's interest in the outcome of the Sikorski deposition as
indicated by her email to Gonek the day after the deposition.  The only logical
reason she would be concerned about the outcome of the Sikorski deposition is
that she was concerned that Bednarski's interest in the bookstore project would
come to light and that would jeopardize the tentative settlement in the state case.
That concern was the driving force behind the motion for the protective order and
the objections to the depositions of Seagraves and Cozzens.  Undeniably, some of

---

[14]  While not expressly denying she attended the December, 2008 meeting
described by Seagraves, Geist stated she did not know anything about the
discussions regarding scheduling of these depositions between Gonek, Warren and
Shafer and that the filing of the motion for protective order and objections to the
depositions of Seagraves and Cozzens was completely unrelated to that.  (3/25/09,
pp. 123-25).  Such a claim is hard to accept in light of the evidence in this case.

the documents petitioners attempted to get from Seagraves and Cozzens were later found to be protected by a privilege, but those were relatively few documents. Certainly nothing was identified that would be "proprietary" and so personal as to Bednarski that it was beyond the scope of normal discovery or otherwise subject to a legitimate privilege claim.  Objections to subpoenas issued to other individuals based on the information being irrelevant or the subpoenas being overly broad are not generally appropriate.  A few meritorious objections to the depositions of Bednarski, Seagraves and Cozzens does not change the conclusion that these efforts were primarily intended to prevent or at least delay the disclosure of Bednarski's interest in the bookstore project.  Circumstantially, it would appear that Gonek and O'Neill attempted to prevent these depositions from taking place and when their efforts failed, Geist, someone who might appear independent of Gonek and O'Neill, took up the same cause by filing the motion for protective order regarding Bednarski's deposition and objecting to the depositions of Seagraves and Cozzens.  The request by Gonek or O'Neill to move the dates of the depositions of Cozzens and Seagraves from December 17, 2008, to December 19, 2008, appears to have been made out of a desire to give Geist additional time to file her objections to the depositions, rather than out of an unavailability of either Cozzens or Seagraves.  Logically, this plan would have come out of the meeting that Seagraves described as taking place just before the scheduled depositions in

December of 2008.  Respondents argue there was no "concerted plan to withhold or block discovery."  (Dkt. 211, Pg ID 6842).  In support of this argument they refer to Gonek's testimony that such was the case.  *Id*.  However, there is persuasive circumstantial evidence that there was a "concerted plan" between Gonek, O'Neill and Geist to block the discovery attempts.  This evidence includes the testimony of Seagraves that O'Neill directed that backdated documents be prepared to suggest that Bednarski had no interest in the bookstore project and that Seagraves was generally available for the deposition as originally scheduled but petitioners' attorneys were told that the deponents were not available for the depositions on the scheduled dates as the basis of the request to adjourn the depositions.  Further, when the objections to the depositions of Cozzens and Seagraves were served on December 18, 2008, the attorneys for petitioners were told that Cozzens and Seagraves would not bring any subpoenaed documents to the depositions then scheduled for December 19, 2008, despite the earlier promise that they would bring the documents in exchange for the agreement to move the date of the deposition to December 19, 2008.  (Dkt. 69, Pg ID 1631-35).

Engaging in this sort of conduct, where the primary motive is obstruction rather than the litigation of meritorious claims, is litigating in bad faith.  Applying the *Metz* test to the conduct of Geist in these circumstances results in the decision that sanctions against her are also warranted.  The motion for the protective order

as to the deposition of Bednarski was substantially meritless as were the objections to the depositions/subpoena duces tecum regarding Cozzens and Seagraves. Geist knew them to be substantially meritless when they were filed and they were primarily intended to prevent the disclosure of information that was detrimental to the interests of Bednarski, information that would have shown that he was behind the bookstore project and that Cozzens was involved in name only. In addition to sanctions being imposed against Geist under the inherent authority of the court, the undersigned also concludes that the conduct described above multiplied the litigation unreasonably and vexatiously and, therefore, sanctions are appropriate for this conduct under 28 U.S.C. § 1927. Geist is also liable for sanctions in an amount that will be later determined.

The evidence in this case does not demonstrate that Victor was directly involved in the meeting where the plan to delay the depositions of Cozzens, Seagraves and Bednarski was made nor was she involved in the execution of that plan by filing the motion for a protective order and the objections to the subpoena duces tecum. The undersigned declines to find Victor liable for sanctions based on petitioners' motion.

C.   Respondents' Claim For Sanctions

Respondents claim that sanctions should be imposed against petitioners based on the claim that their position lacks merit and that they are pursuing their

claims in this litigation only to gain an advantage in the related state case or out of

retaliation for Victor's successful litigation in another case.[15]   The undersigned

finds that petitioners' claims are substantially meritorious and therefore

respondents' request for sanctions against petitioners is denied.

        D.    <u>Request to Seal the Record</u>

Geist requests that the record in this matter be sealed because it contains

false allegations that reflect badly on her.   The undersigned finds that at least some

of petitioners' allegations were true and that the other allegations had a basis in the

record such that petitions' contentions were reasonably based on the available

evidence.   Sealing of the record is contrary to the principle of an open and public

court and there is no compelling reason to do that here.

**V.    RECOMMENDATION**

For the reasons set forth above, the undersigned **RECOMMENDS** that

defendants' motion for sanctions be **GRANTED** in part.

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

---

[15]   Geist alleges that petitioners are motivated by an attempt to seek retaliation as a result of some other litigation.  (Dkt. 209, Pg ID 6788, n. 21). There is absolutely no evidentiary support for such a claim.

72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 6, 2012

s/Michael Hluchaniuk
Michael Hluchaniuk
United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

     I certify that on February 6, 2012, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Jonathan M. Colman, Richard G. Convertino, David R. Draper, Ben M. Gonek, Matthew J. Hoffer, Dean Koulouras, Paul T. O'Neill, Richard B. Sands, Cindy Rhodes Victor, and David W. Warren</u>.

s/Darlene Chubb_____
Judicial Assistant
(810) 341-7850
darlene_chubb@mied.uscourts.gov
